FILED

2013 Aug-07  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LEON TIFT,** | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | **2:12-cv-01684-KOB** |
| v. | ) | |
| | ) | |
| **HUBBELL POWER SYSTEMS, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant Hubbell Power Systems, Inc.'s Motion for Summary Judgment. (Doc. 22). Plaintiff Leon Tift alleges that Hubbell paid him less than Caucasian employees and terminated him because of his race and retaliated against him because of his complaints of racial discrimination. Hubbell argues that it did not pay Mr. Tift less because of his race and that it did not terminate him because of his race or in retaliation for his complaints of discrimination but terminated him because of insubordination. Hubbell argues that no genuine issues of material fact exist and it is entitled to judgment as a matter of law, but Mr. Tift maintains that several issues of material fact exist in the record on both of his claims. Because no genuine issue of material fact exists and because Mr. Tift did not make a prima face showing of discrimination or retaliation, Hubbell is entitled to judgment as a matter of law, and the court will GRANT summary judgment for Hubbell and ENTER JUDGMENT for Hubbell and against Mr. Tift.

I.     STATEMENT OF FACTS

    A.     Factual History

        1.     Preliminary Matters

At the outset, the court would like to explain how it compiled the statement of facts for purposes of this opinion. In response to Hubbell's motion for summary judgment, Mr. Tift wrote a sworn declaration disputing many of Hubbell's allegations. *See* Doc. 28-1.  Many of the paragraphs contained in Mr. Tift's declaration, including portions of paragraphs 3, 5, 7, and 8, are not based on his personal knowledge.

Additionally, Mr. Tift generally objects to Hubbell's use of testimony from Marty Brack, Hubbell's Human Resources Manager, on any facts relating to pay issues. Although Mr. Tift is correct that Brack may not have first hand knowledge of why certain pay decisions were made, he is the custodian of the pay and employment records for Hubbell. Testimony relating to Hubbell's payroll records, personnel files, and applications for employment, which are attached as exhibits to Brack's Declaration, is appropriate. As a corporate officer of Hubbell, Brack is presumed to possess personal knowledge of a fact contained in the corporation's records, and the properly authenticated records themselves are admissible as business records. *See Catawba Indian Tribe of South Carolina v. State of South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992) ("[O]rdinarily, officers would have personal knowledge of the acts of their corporations. Therefore, since the [defendant] did not set forth facts, by affidavit or otherwise, that would show that the officers did not have personal knowledge, the personal knowledge requirement is satisfied as to those affidavits."). Thus, the court will accept Brack's declaration on the issue of

Hubbell employees' pay and employment records as supported by the business records attached to his declaration.

As a final preliminary matter, the court notes that it will not include any facts about Mr. Tift's overtime work at Hubbell or Hubbell's refusal to cross-train Mr. Tift on the steel cell CNC machine. Hubbell included argument about these claims in its motion for summary judgment, but Mr. Tift did not substantively respond to these arguments in his responsive brief. Thus, the court deems them abandoned, and will include only facts related to Mr. Tift's remaining claims: disparate pay, discrimination based on his termination, and retaliation. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned).

<u>2.      Mr. Tift's Employment at Hubbell</u>

Hubbell operates a foundry in Leeds, Alabama, that manufactures aluminum, brass, and bronze connectors and hardware for electrical utility companies. The Leeds facility consists of three foundries, a secondary machining operation, and an assembly operation. The secondary operations are divided into seven subgroups, and Mr. Tift worked in the Fargo unit. The Fargo unit has four different Computer Numeric Controlled ("CNC") machines in it: the splice cell, dead end cell, terminal cell, and steel eye lathe cell machines.

Mr. Tift, an African American, started working at Hubbell on January 27, 2009, as a temporary-to-full-time employee through a temporary employment agency. On April 20, 2009, Hubell hired Mr. Tift as a regular, full-time Utility II Operator in the Fargo Unit. On April 27, 2009, Mr. Tift was reclassified as a Utility Person III. On February 18, 2012, Hubbell promoted

Mr. Tift to Production Specialist. As a Production Specialist, Mr. Tift worked in the Fargo unit and operated the terminal cell CNC machine on the first work shift. At the time of his termination, Terry Watson was Tift's Supervisor. Watson reported to Production Manager Jimmy Roper, and Roper reported to Operations Manager Patrick Byerman.

Employees in secondary operations, like Mr. Tift, are represented by the International Association of Machinists and Aerospace Workers, Local Lodge 271, and a collective bargaining agreement ("CBA") governs the terms and conditions of secondary operations employees' employment at Hubbell. Employees are also governed by Hubbell's Work Rules, a set of guidelines for attendance and behavior. The Work Rules divide disciplinary violations into four classes: A, B, C, and D and employ a progressive set-system in which employees progress through seven disciplinary steps from verbal warning to discharge, depending on the severity and number of violations. Under the Work Rules, refusal to do work assigned, refusal to obey orders of a supervisor, or committing other acts of insubordination are Class C violations, which can advance an employee to step 5 or 6 in the disciplinary progression or subject the employee to termination after an investigation by Hubbell.

<u>3.</u>     <u>Mr. Tift's Compensation and the CBA Wage Scale</u>

The CBA sets forth a wage scale for each job classification. *See* "Occupational Titles and Wage Schedule," Doc. 24-1, at 25. Hubbell asserts that its policy is that employees are paid a starting rate within the scale commensurate with their level of skill and experience. Brack, Human Resources Manager for Hubbell, stated in his declaration that in accordance with this policy, "employees with no experience start at the minimum rate for the job classification and progress through the range in accordance with the rates set by the wage scale." (Doc. 24-1, at 6).

4

Mr. Tift alleges that the wage scale does not state that employees hired from outside the company with CNC experience would start at a level higher than the minimum wage setting or be treated differently from employees already working for Hubbell. (Doc. 28-1, at 2). Roper testified that when setting the rates of pay for Production Specialists, "based on whatever the rate was, if there was a CNC operator, depending on the experience they had and how long they had worked running CNC equipment, they could have started out at the halfway point or started out at top pay [on the wage scale]." (Doc. 24-14, at 8). Roper also specifically testified that in setting Mozelle Wood's starting wage as a Production Specialist, he considered "[h]er ability, her experience as a CNC operator." *Id.*

Mr. Tift's statement in his declaration disputing the existence of such a policy is not based on personal knowledge but instead based on the absence of the policy in the CBA. Although Mr. Tift is correct that Hubbell's policy of honoring prior CNC experience for Production Specialists is not specifically stated in the wage scale, Brack's testimony that it is the Hubbell's policy and Roper's testimony that he and HR made salary decisions "depending on the experience" of the employee with CNC equipment is sufficient to establish that this practice was in fact Hubbell's policy. (Doc. 24-14, at 8). Additionally, Mr. Tift does not present any evidence that Hubbell hired an individual with CNC experience and did not start the employee higher on the wage scale because of such experience. Regardless of the wage level at which an employee begins, Union employees are entitled to an automatic twelve cents wage increase every three months.

At the time Mr. Tift was promoted to Production Specialist, he had no CNC experience and no relevant educational background. Accordingly, Mr. Tift was paid at the entry level rate of

$12.67 per hour in accordance with the CBA. Mr. Tift then progressed through the wage scale, receiving a twelve cent wage increase every three months until September 27, 2010. On September 27, 2010, the minimum and maximum rates for Production Specialists increased to $13.11-$16.13. Mr. Tift's new rate of pay was set at $13.36 per hour, which Hubbell alleges was commensurate with his experience. Mr. Tift, however, alleges that this rate of pay was not commensurate with his experience and stated in his declaration that he had "greater knowledge" of the CNC machines than his coworkers and actually trained some coworkers on the CNC machines as they came into his department. (Doc. 28-1, at 2). After September 27, 2010, Mr. Tift continued to receive twelve cent wage increases every three months.

Mr. Tift alleges that he was paid less than Caucasian Production Specialists Thomas Casey, Michael Burkhalter, David Walker, and Mozelle Wood. Hubbell promoted Casey to Production Specialist on September 20, 2010, and started his wage at $12.67 per hour. Casey's supervisor then learned that Casey had prior CNC experience and accordingly increased his rate of pay to $13.11 per hour. (Doc. 24-1, at 8, Doc. 24-2, at 16). Casey's application for employment at Hubbell specifically lists "CNC operator" under "Training." (Doc. 24-2, at 16). Hubbell promoted Burkhalter to Production Specialist on March 22, 2010, and he was paid the entry level rate of $12.67 per hour because he had no prior CNC experience. (Doc. 24-1, at 9).

Hubbell promoted Walker to Production Specialist on August 18, 2008, and he had three years of CNC experience. (Doc. 24-1, at 8, 38). Because of his prior CNC experience, Walker's rate of pay was set at $14.68 per hour. (Doc. 24-2, at 5). Walker's application for employment at Hubbell specifically lists "Ran CNC machine" under "Training." (Doc. 24-2, at 5).   Hubbell hired Wood as a Production Specialist on February 24, 2009, and she had two years of CNC

experience. (Doc. 24-1, at 8).   Wood's resume application for employment at Hubbell specifically lists "Operated CNC operator" under "Training," and her resume, which was submitted with her application, lists that she "Operated a CNC" in a previous position. (Doc. 24-1, at 34, 38). Because she had prior CNC experience, her rate of pay was set at $15.05 per hour. *Id.* at 37.  Both Walker and Wood worked on Haas CNC machines— a different and more complex system than Mr. Tift worked on in the Fargo Unit.

Mr. Tift also alleges that Andrew Paullin, a Caucasian, was paid more than he was paid. However, Mr. Tift admits that Paullin was not a Production Specialist and did not operate a CNC machine but was a Utility III operator responsible for setting up and welding aluminum products. At the time of Mr. Tift's promotion to Production Specialist, Paullin was paid at a rate of $11.31 per hour, and Paullin continued to progress through the wage scale and was paid at a final rate of $12.08 per hour.

Mr. Tift does not dispute that during his employment at Hubbell and shortly thereafter, African American Production Specialists Allen Bailey, Marcus Salter, and William Watford were paid above minimum or at the top of the applicable wage scale. All three individuals were paid a starting rate of $14.68 per hour as Production Specialists, the same as Caucasian Walker and higher than Caucasians Burkhalter and Casey.

4.     Complaints of Discrimination

Hubbell has an Equal Employment Opportunity Policy that states it will "recruit, employ, train, promote, and compensate [its] employees without regard to race . . .." (Doc. 24-8, at 40). Mr. Tift disputes that Hubbell has any meaningful EEO policy "based on [his] observation." (Doc. 28-1, at 1). However, the testimony Mr. Tift cites to support his dispute is that of

7

Operations Manager Byerman. The cited testimony states that Hubbell supervisors and managers had to go through yearly training on discrimination, which does not support Mr. Tift's contention that Hubbell had no meaningful EEO policy. (Doc. 24-25, at 12-13). Hubbell's EEO policy states than an employee may report a claimed violation of the policy to his supervisor, manager, the Human Resources Department, or the Business Unit Director. An employee may also report an alleged violation of the policy to ListenUp Group, LLC, an independent, confidential-reporting service that protects the anonymity of reporters.

Mr. Tift alleges that he called the ListenUp hotline on October 19, 2010 to complain about his pay.[1] In his declaration, Mr. Tift stated that he could not recall whether he gave his name on the call but stated that he did give the hotline specific identifying information about his situation such as his employer, his job title, and the names of his supervisors. (Doc. 28-1, at 4). Hubbell alleges that no one at the Hubbell Leeds facility where Mr. Tift worked was aware of the 2010 call, but Mr. Tift disputes this based on Brack's testimony that Human Resources is made aware of calls by its employees to ListenUp. (Doc. 24-10, at 8). Roper, Byerman, and Williams all testified that they were not aware of Mr. Tift's 2010 call to ListenUp. (Doc. 24-14, at 5; Doc. 24-15, at 14; Doc. 24-16, at 8).

In his declaration, Mr. Tift testified that he also made a call to ListenUp on August 4, 2011, to complain about "retaliation and harassment" and that a ListenUp representative told him that Hubbell's Human Resources Director investigated and found no basis for his claim. (Doc. 28-1, at 4).

---

[1] In his deposition, Mr. Tift testified that he called ListenUp sometime in the fall of 2010, but in his declaration he clarified that this call, which Hubbell stated occurred in August 2010, actually occurred on October 19, 2010. (Doc. 28-1, at 4).

5.    Hubbell's Discipline and Termination of Mr. Tift

In February 2011, Mr. Tift reported directly to Supervisor Kerry Watson, who reported to

Production Manager Cass Hutcheson. On February 15, 2011, Watson observed Mr. Tift sitting

down in his work area and not running his machine, and Watson asked Mr. Tift why he was not

working. Mr. Tift replied that he did not want to get too ahead of his co-workers, and then

Watson told Mr. Tift to either run his machine or help his co-workers process terminals or wax

parts. Hubbell alleges that Mr. Tift "became angry, raised his voice, and replied that processing

terminals and waxing was not his job and refused to either process terminals, wax, or run his

machine." (Doc. 23, at 15). Mr. Tift testified that he did not raise his voice or argue with Watson

but simply told him that the tasks Watson asked him to perform were not in his job description.

Mr. Tift admits that he did not immediately do what Watson asked him to at that time, but he

eventually began running his machine.

Watson then reported Mr. Tift's "refusal to do work assigned" to Production Manager

Hutcheson. (Doc. 24-5, at 6).  Hutcheson called Mr. Tift into his office and instructed him that

refusing to perform assigned work was insubordination. Hutcheson issued a step-five written

warning and suspended him for five days without pay. (Doc. 24-7, at 37). Mr. Tift alleges that

Hubbell "skipped a step" in the disciplinary process and should have given him a step-four

written warning with a three day suspension. (Doc. 28-1, at 7). Mr. Tift, however, points to no

evidence that a step-five warning was inappropriate other than his own declaration and does not

dispute that insubordination is a Class C violation, which can warrant a step 5 or step 6

disciplinary action.

9

On March 1, 2011, Jimmy Roper replaced Hutcheson as Production Manager. At the time he began this job, Roper was aware of the on-going problem of employees leaving their work stations five to ten minutes prior to lunch and other breaks. Roper met with all employees in the secondary machining and assembly operations, including Mr. Tift, regarding lunch and break times and told them that leaving their work stations even five minutes prior to lunch and other breaks hurt productivity.

On August 4, 2011, Roper observed that Mr. Tift had stopped his machine approximately five minutes before the lunch hour and was talking with a co-worker, Myla Wildes, in another work area. Roper also observed that Mr. Tift had what appeared to be a lunch bag in one hand and a Milo's tea in the other hand. Roper approached Mr. Tift and told him to return to his machine. The accounts of what happened after Roper told Mr. Tift to return to his machine are divergent. Roper testified as follows:

> So I walked over and said: Leon [Tift], you've got five minutes until lunchtime, you need to go back and start your machine up.
> And he didn't talk to me. He hollered out: You can't tell me when I can go to the bathroom or not.
> I said: Nobody said anything about the bathroom. I want you to go back to your machine and quit hindering this lady over here from doing her job.
> And he kept throwing up that me or anybody else couldn't tell him what to do and when he could go to the bathroom.
> I said: Leon, I'm telling you again to go back and start your machine up. You've got five minutes.
> And he started with his finger, not hitting me, but real close, just got up very close to my face, telling me I couldn't do that. . . . I think I said something to him like: If you don't go back to work, we might have to walk you out of the plant or walk you out to the gate.
> And, again, he kept throwing up we couldn't tell him when he could go to the bathroom. And I told Kerry [Watson], I said: Come on, Kerry, let's go and let Dirk [Byerman] know what's going on.

10

> And I went and told Dirk Byerman, my boss, what was going on. And he said we need to get him off the floor, go bring him in my office and get the union reps, have them in here.

(Doc. 24-14, at 15).

In his declaration, Mr. Tift contends that he was suffering a pressing need to use the restroom two minutes before his lunch break and so left his machine to go to the restroom. (Doc. 28-1, at 7). He alleges that he took his lunch bag and drink with him when he left his work station because he knew the lunch alarm would likely ring before he finished using the restroom. On his way to the restroom, Mr. Tift alleges that his co-worker, Myla Wise, stopped him to ask him a question about her machine and that Roper approached him while he was answering Ms. Wise's question.  Mr. Tift disputes Roper's version of the exchange and stated in his declaration:

> I did not shout or yell at Mr. Roper. Rather I told him "I was in a tight" and that I had filled my cart with parts. I told him I really needed to use the restroom. He told me to return to my machine, I reiterated I needed to use the restroom and that Roger Brown takes a break every day five minutes before our scheduled breaks, and nothing is said to him. I again said I needed to use the restroom and would like to use the restroom, and that I was ahead of production. Mr. Roper told me to return to my machine or he would write me up. Because I did not want to have a bowel movement on myself, I told him that he would need to do what he needed to do because I had to use the restroom. During this exchange, Mr. Roper first raised his voice. I did raise my voice slightly in response, but I did not yell or shout. He, however, did. I did not point my finger at him. I did not touch him. I did not point my finger at his chest.

(Doc. 28-1, at 4-5).

Roper reported the incident to Operations Manager Byerman, and Byerman told Roper to have Mr. Tift report to his office. Roper found Mr. Tift in the employee break room and advised him that Byerman wanted to see him in his office. Roper testified that Mr. Tift refused to report to Byerman's office and Mr. Tift repeatedly told him that he would go when his lunch break was over. Mr. Tift, however, disputes that he refused to go and instead alleges that Roper was "loud,

11

irate, and rude . . . . belligerent and confrontational" in asking him to report to Byerman's office. (Doc. 28-1, at 5). Mr. Tift alleges that he told Roper he would like to finish his lunch and that Roper responded by asking him, "'[A]re you refusing, boy?'" *Id.* Roper testified that he did not call Mr. Tift "boy" and that he had never called anyone "boy" during his employment with Hubbell. (Doc. 24-24, at 16). Mr. Tift alleges he told Roper he was not refusing but that he was uncomfortable walking with Roper to Byerman's office.

Roper returned to Byerman's office and reported to Byerman that Mr. Tift refused to report, and not long after, Mr. Tift arrived at Byerman's office. Byerman, Roper, Watson, the local President of the Union, and one Union representative met with Mr. Tift, and Byerman asked Mr. Tift to explain what had happened. Roper testified that Mr. Tift was "irate," "hollering," and called Roper a liar. (Doc. 24-24, at 15).  Byerman testified that Mr. Tift shouted, refused to sit down, and refused to answer his questions. (Doc. 24-15, at 10). Mr. Tift admits saying that Roper was not telling the truth about what happened, but he disputes that he was yelling or refusing to cooperate. (Doc. 28-1, at 5).

Additionally, Mr. Tift alleges that at the meeting he told everyone present that Roper had called him "boy" and that "the company shouldn't allow racism, retaliation and discrimination" like was currently going on. *Id.*  Hubbell disputes that Tift made a specific complaint of discrimination or retaliation and alleges that because of Mr. Tift's "disruptive behavior," Byerman suspended Mr. Tift pending the outcome of an investigation into the incident. (Doc. 23, at 18-19).

Mr. Tift alleges that during his time at Hubbell he observed five Caucasian employees refuse work instructions from Roper without any consequence:  Mozelle Wood, Thomas Casey,

Michael Burkhalter, Roger Brown, and Myla Wildes.  *See* Doc. 24-6, at 17-18; 27; 36-37; and 50.

After the meeting with Mr. Tift, Byerman and Roper reported the incident to Robert Williams, Hubbell's Director of Human Resources, because Marty Brack was on vacation at the time of the incident. Williams testified that he told Byerman, Roper, and Watson to investigate the incident, and Byerman testified that he told Roper to get with Human Resources to start an investigation. (Doc. 24-16, at 5; Doc. 24-15, at 11). Williams testified that he did not know if the investigation included getting a statement from Mr. Tift or if anything in the investigation reflected Mr. Tift's version of events. (Doc. 24-16, at 6). Byerman testified that he believes Human Resources conducted the investigation in this case but was not sure who in HR performed the investigation. (Doc. 24-15, at 9).

In his declaration, Williams stated that in the course of the investigation, Hubbell collected witness statements from Watson, Roper, and Hubbell employees Michael Gates, Brenda Nichols, and Myla Wildes. (Doc. 24-18, at 3). Mr. Tift disputes the truth of the witness statements because he claims no employee was close enough to hear what transpired between himself and Roper. (Doc. 28-1, at 8).[2]

Byerman testified that he, Roper, and Williams decided to terminate Mr. Tift after reviewing the investigation documents. (Doc. 24-15, at 9).  Based on the investigation as well as

---

[2] The court will not consider the substance of the witness statements for purposes of the motion for summary judgment because Mr. Tift disputes the truth of the statements, but it merely notes their existence as part of Hubbell's investigation.

Mr. Tift's earlier suspension for insubordination, Byerman, Williams and Roper decided to terminate Mr. Tift's employment effective August 8, 2011.[3]

B.    Procedural History

On April 25, 2012, Mr. Tift filed a two-count Complaint against Hubbell under 42 U.S.C. § 1981 alleging race discrimination and disparate treatment in count I and retaliation in count II. (Doc. 1). After discovery in this case, Hubbell filed a motion for summary judgment on March 29, 2013. The parties fully briefed the motion and the court now considers it.

II.    STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence

---

[3]The parties' undisputed statement of facts states that Hubbell terminated Mr. Tift on August 8, *2013*, but the court assumes this is a typographical mistake and that Hubbell actually fired Mr. Tift on August 8, *2011*.

14

fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). "Even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

16

III.    LEGAL DISCUSSION

    A.    Discrimination

        1.    Disparate Pay

At the outset, the court notes that both of Mr. Tift's claims are pled as § 1981 claims. Because Title VII and § 1981 claims rely on the same prima facie case to show discrimination and retaliation, the court considers legal precedent decided under both statutes. *See Bryant v. Jones,* 575 F.3d 1281, 1286 n. 20 (11th Cir. 2009) ("[D]iscrimination claims . . . brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework.").

To establish a prima facie case of wage discrimination under Title VII or § 1981, a plaintiff must demonstrate that "(1) [he] was a member of a protected class; (2)[he] received low wages; (3) similarly situated employees outside the protected class received higher pay; and (4)[he] was qualified to receive the higher pay." *Gray v. City of Jacksonville*, 492 F. App'x 1, 4 (11th Cir. 2012) (citing *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)). The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quotation marks and citation omitted). The Eleventh Circuit has further elaborated that "[t]he comparator must be nearly identical to the plaintiff." *Id.*

17

Mr. Tift identified three Caucasian Production Specialists as comparators: Thomas Casey, David Walker, and Mozelle Wood.[4]  The parties do not dispute that Mr. Tift was paid less than Casey, Walker, and Wood; however, as Hubbell points out, Casey, Walker, and Wood are not valid comparators because they all had prior experience working CNC machines that Mr. Tift did not have. Casey, Walker, and Wood's applications for employment all specifically note previous CNC experience that Mr. Tift did not have, and Hubbell has produced evidence that when setting the rate of pay for Production Specialists, it considers prior experience running CNC machines. Mr. Tift cannot simply point to the absence of a specific written policy stating that employees with CNC experience would start higher on the wage scale as evidence that such a policy does not exist. Mr. Tift's *belief* that Hubbell does not have such a policy and is discriminating him is insufficient to create a genuine issue of material fact on this issue. *See Mosley v. MeriStar Mgmt. Co., LLC,* 137 F. App'x 248, 250 (11th Cir. 2005) (stating that "personal belief, unsupported by other evidence, does not suffice" to establish discrimination).

The Eleventh Circuit has recognized that past education and experience can factor into whether a comparator is similarly situated in a disparate pay claim. *See Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 607 (11th Cir. 2008) (finding that a plaintiff and an asserted comparator were not similarly situated because the asserted comparator had education, training, and experience that the plaintiff did not have); *Petty v. United Plating, Inc.*, 2012 WL 2047532, *20 (N.D. Ala. 2012) ("relevant is whether the employees have different educational

---

[4] Although Hubbell discusses two additional individuals in its motion for summary judgment, Michael Burkhalter and Andrew Paullin, Mr. Tift does not allege in his responsive brief that they are comparators. Thus, the court will deem those arguments abandoned by Mr. Tift.

18

backgrounds, levels of experience, or other qualifications."). Because all three proffered comparators had relevant CNC experience that Hubbell took into account in setting the wage for its Production Specialists, Mr. Tift has failed to produce any valid, similarly situated comparator for his disparate pay claim.

Additionally, Walker and Wood worked on Haas CNC machines— a different and more complex system than Mr. Tift worked on in the Fargo Unit. Thus, they are not similarly situated because their work tasks significantly differ from Mr. Tift's. *See Lee*, 285 F. App'x at 606 ("The plaintiff must show that he shared the same type of tasks as the comparators."). Even if Mr. Tift could produce a similarly situated comparator, undisputed evidence exists that other African American Production Specialists were paid the same or higher rates than some Caucasian Production Specialists. This evidence undermines any argument that Mr. Tift's compensation was based on race instead of commensurate with his experience and education on the wage scale. Without evidence of any valid comparator, Mr. Tift cannot make a prima facie showing of discriminatory compensation, and the court will GRANT summary judgment for Hubbell on this claim.

### 2.    Termination

#### A.    *McDonnell Douglas* Analysis

Mr. Tift alleges that Hubbell engaged in unlawful race discrimination under 42 U.S.C. § 1981 in count I of his Complaint.  One way to establish a claim of racial discrimination is through direct evidence.  *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).  If the plaintiff cannot prove discrimination by direct evidence, as in this case, the plaintiff generally must establish his prima facie case through the burden shifting analysis

articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Nevertheless, the "ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated . . . remains with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 251-52 (1981).

    A plaintiff can establish a prima facie case of racial discrimination based on disparate

treatment by showing that (1) he belongs to a racial minority, (2) he experienced an adverse job

action, (3) his employer treated similarly situated employees outside his classification more

favorably, and (4) he was qualified to do the job. *Knight v. Baptist Hosp. of Miami, Inc.*, 330

F.3d 1313, 1316 (11th Cir. 2003). Hubbell does not dispute that Mr. Tift is a member of a

protected class or that he suffered an adverse employment action when he was terminated.

However, Hubbell does argue that no similarly situated employee outside of Mr. Tift's protected

class exists. In his responsive brief, Mr. Tift effectively concedes that no similarly situated

comparators exist but argues that the lack of such a comparator should not defeat a prima facie

case when otherwise sufficient circumstantial evidence of discriminatory intent exists.

### B.    "Mosaic" Analysis

    Mr. Tift relies on a recent line of Eleventh Circuit cases that ruled a plaintiff who has not

identified proper comparators can still make a prima facie showing of discrimination through

sufficient circumstantial evidence.  In *Smith v. Lockheed–Martin*, the Eleventh Circuit stated that

"the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a

plaintiff to survive a summary judgment motion in an employment case." 644 F.3d 1321, 1328

(11th Cir. 2011). A plaintiff can survive summary judgment in the absence of a comparator if he

"presents circumstantial evidence that creates a triable issue concerning the employer's

discriminatory intent." *Id.* Such a triable issue of fact exists "if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' " *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

In *Lockheed-Martin*, the circumstantial evidence presented by the plaintiff was extensive: "there was a documented history of disparate treatment of Caucasian and African–American employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, and a news program reporting the defendant's struggles with racism in the workplace." *Davis v. Dunn Const. Co.*, 872 F. Supp. 2d 1291, 1312 (N.D. Ala. 2012) (discussing *Lockheed-Martin*,  644 F.3d at 1321).

In this case, Mr. Tift alleges that he presents a "convincing mosaic of circumstantial evidence" that a jury could find amounted to discrimination: 1) Roper's use of the word "boy" to address Mr. Tift; 2) Hubbell's tolerance of Caucasian employees objecting to and refusing supervisors' directives without disciplinary consequences; and 3) Mr. Tift's denial of any actual insubordination. The court will take each piece of evidence in turn.

The first piece of evidence to which Mr. Tift points as supporting his prima facie case of discrimination is Roper's use of the word "boy" when addressing him on August 4, 2011. Roper recognized in his deposition that "boy" is considered a racist slur, and Mr. Tift argues that Roper harbored a racial bias against Mr. Tift that influenced his decision to terminate Mr. Tift.

Mr. Tift, however, only cites to one occassion on which Roper called him "boy." The court finds that Roper's isolated use of the word "boy" when speaking to Mr. Tift on one occasion does not establish discriminatory animus or intent. *See Jones v. Bessemer Carraway*

*Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998) (finding that *three* discriminatory remarks by a supervisor were not sufficient to establish a prima facie case of discrimination). If Mr. Tift had produced evidence that Roper frequently used the term "boy" or further evidence that illustrated Roper's discriminatory attitude toward African Americans, then this case would be a very different one. *See e.g. Jackson v. Dunn Const. Co.*, ___ F. Supp. 2d ___, ___; 2013 WL 754716, * 5 (N.D. Ala. Feb. 21, 2013) (holding that the plaintiff presented sufficient circumstantial evidence to create a prima facie case of discrimination based on the plaintiff's testimony that his supervisor called him "boy" over 200 times and failed to discipline a Caucasian employee who used the "n" word).

Secondly, Mr. Tift argues that his observation of other employees refusing to follow work instructions from Roper who did not receive discipline for insubordination helps to make a prima facie showing of discrimination. *See* Doc. 24-6, at 17-18; 27; 36-37; and 50. Mr. Tift testified that he had seen Roper give Mozelle Wood, Michael Burkhalter, Myla Wildes, Thomas Casey, and Roger Brown instructions; none of those Caucasian employees followed the instructions; and then Roper did not discipline them for their insubordination. Mr. Tift, however, admitted in his deposition that he could not specifically testify as to what happened each time one of these Caucasian employees was allegedly insubordinate and was basing his testimony on "what he heard" although he "couldn't hear the whole thing." *Id.* at 17.

Because Mr. Tift does not provide any specifics concerning these incidents, no personnel records of other employees about the incidents he cites are a part of the record, and none of the alleged comparators have testimony in the record, it is impossible for the court to conclude that these Caucasian employees engaged in nearly identical conduct as Mr. Tift. Without any such

evidence, their alleged difference in treatment does not "imply the presence of racial discrimination." *See e.g. Bell v. Crowne Management, LLC*, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012) (stating that because the plaintiff did not put forward any specific evidence about comparator conduct in presenting circumstantial evidence to prove a prima facie case of discrimination, the court must grant the defendant's motion for summary judgment).

Finally, in an effort to make a prima facie showing through circumstantial evidence, Mr. Tift disputes that he was insubordinate and argues that his dispute of Hubbell's legitimate reason for his termination is enough to preclude summary judgment. In support of this argument Mr. Tift cites *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000). In *Munoz*, the Eleventh Circuit ruled that the trial court did not err by denying the defendant's Rule 50(b) motion for judgment as a matter of law. The plaintiff in that Age Discrimination in Employment Act case was a sixty-four year old room service waiter at the defendant's resort who was fired after working for the defendant for twenty-seven years. The plaintiff had never received any official reprimands prior to his termination and had received numerous performance awards during his tenure as a room service waiter. The general manager of the resort issued the plaintiff a written reprimand for kissing a co-worker on the cheek and instructed the plaintiff not to discuss the reprimand with anyone. The Resort claimed that the plaintiff confronted the general manager's secretary about the reprimand and "chided her for her complicity," but the plaintiff disputed any such confrontation.  *Id.* at 1344. The Resort terminated the plaintiff based on his insubordination for discussing the reprimand with the general manager's secretary and then replaced the plaintiff with a much younger man who had received at least three written reprimands in his tenure with the resort.

The Eleventh Circuit concluded that the plaintiff "presented enough evidence from which a reasonable jury could infer that the Resort's proffered explanation for his termination was pretextual." *Id.* at 1345. First, the court notes that Rule 50(b)'s standard that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" is different than Rule 56's standard that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 50, 56.

The jury in *Munoz* heard evidence that included the plaintiff's lack of previous disciplinary problems; the Resort's awareness and acceptance of the plaintiff's practice of kissing female co-workers; the several written warning's the plaintiff's replacement had received; and the Resort's termination of the plaintiff after only one written warning, which contravened the Resort's policy as outlined in its employee handbook that termination would follow three warnings. *Id.* Here, no such evidence exists. The only similarity between *Munoz* and this case is that both plaintiffs dispute their employers' proffered reason for their termination— insubordination. Mr. Tift argues that his denial of insubordination creates a genuine issue of material fact, but that is not the case and not what the Eleventh Circuit ruled in *Munoz.*

Mr. Tift's denial of insubordination only creates a genuine issue of material fact if he also presents evidence that illustrates Hubbell's discriminatory intent like the plaintiff did in *Munoz*. *See Bassano v. Hellmann Worldwide Logistics, Inc.*, 310 F. Supp. 2d 1270, 1280 (N.D. Ga. 2003) ("Plaintiff's personal belief that Defendant unlawfully discriminated against h[im], no matter how strongly held . . . cannot create a genuine issue . . . when that belief is unsupported by any evidence in the record.").  However, Mr. Tift has not done so in this case. Even taking every fact Mr. Tift testified to as absolute truth, Hubbell is still entitled to judgment as a matter of law.

As is often stated, "[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)). "[I]f the employer acted on its honestly-held belief that the employee had engaged in misconduct, even if it was mistaken, there is no discrimination." *East v. Clayton Cnty., GA*, 436 F. App'x 904, 912 (11th Cir. 2011) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Mr. Tift's denial of any wrongdoing combined with the other circumstantial evidence he presented is not sufficient to make a prima facie showing of discrimination and pales in comparison to the overwhelming circumstantial evidence of discrimination in cases such as *Munoz* and *Lockheed-Martin*.

Although Mr. Tift is correct that a prima facie case of discrimination can be built on circumstantial evidence alone, the Eleventh Circuit did not intend to allow the *McDonnell Douglas* elemental prima facie case to be substituted with, and satisfied by, "any weak, amorphous whiff of discrimination." *Bell*, 844 F. Supp. 2d at 1233. The record Mr. Tift has produced in this case "is more than a few tiles short of a mosaic, let alone a convincing one." *Alkhatib v. Steadman, et al.*, 2011 WL 5553775, *8 (S. D. Ala. Nov. 15, 2011). "[T]he ultimate burden of persuading . . . that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,* 446 F.3d 1160, 1162 (11th Cir. 2006) (quotation omitted). Although Mr. Tift has created an issue of fact by denying he was ever subordinate, the dispute does not raise a genuine issue of material fact that defeats the motion for summary judgment or, taken as true, does not establish a prima facie

case of discrimination. "The inquiry. . . centers upon the employer's beliefs, and not the employee's own perceptions of his performance. . . . Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (citations omitted).

Mr. Tift has not presented sufficient direct or circumstantial evidence to show that the real reason for his termination was discrimination. For these reasons, the court finds Mr. Tift has failed to make a prima facie showing of discrimination for his termination, and the court will GRANT summary judgment for Hubbell on this claim.

B.    Retaliation

Mr. Tift charges Hubbell with retaliation in count II of his Complaint. Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1982). The court analyzes claims of retaliation for engaging in a protected activity, like those for discrimination, under the *McDonnell Douglas* burden-shifting framework. *Bernard v. SSA Security, Inc.*, 2008 WL 4823987, at *2 (11th Cir. 2008).  Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of retaliation. *McDonnell Douglas*, 411 U.S. at 802.

To establish a prima face case of retaliation under Title VII, "a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (internal quotation marks omitted).

To constitute "statutorily protected expression," a plaintiff must show he either opposed unlawful practices or he participated in a Title VII proceeding.  42 U.S.C. § 2000e-3(a) (1982). Mr. Tift testified that he complained of discrimination and disparate pay to ListenUp in October 2010 and August 4, 2011, and that he complained of race discrimination and retaliation to Byerman on August 4, 2011. Although Hubbell disputes that Mr. Tift complained of race discrimination to Byerman, Mr. Tift's testimony is sufficient to satisfy the first element of a prima facie case of retaliation because on summary judgment the court must take the evidence in the light most favorable to Mr. Tift.  *See Forbus v. Sears Roebuck & Co.*, 30 F.3d 1402, 1403 n. 1 (11th Cir. 1994)(stating that on a motion for summary judgment, "[t]he evidence is construed in the light most favorable to the plaintiff, and we draw all reasonable inferences most favorably to [the] plaintiff").  Mr. Tift also satisfies the second requirement of an adverse employment action because Hubbell does not dispute that it terminated Mr. Tift on August 8, 2011.

To make a  prima facie showing of retaliation, Mr. Tift must present some evidence of causation. "The causal link element is construed broadly so that a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks omitted). Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of

material fact about a causal connection," but to satisfy this showing, a plaintiff must establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  The parties argue extensively about the temporal proximity of Mr. Tift's ListenUp complaints to his termination and about Mr. Tift's supervisors' knowledge of the ListenUp complaints. Even if Mr. Tift's supervisors knew about the 2010 ListenUp complaint, the temporal proximity to his termination in 2011 is too remote to satisfy the causation element. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."). Regardless of the "anonymous" ListenUp complaints, Mr. Tift has shown that he engaged in protected activity by complaining about race discrimination and retaliation on August 4, 2011, to Byerman and other supervisors who were present at the meeting.

Mr. Tift testified that he complained about race discrimination and retaliation on August 4, 2011, when meeting with his supervisors before they sent him home, and that is sufficient to show that Byerman and Mr. Tift's other supervisors had knowledge of the complaint before they terminated him on August 8, 2011.  This close temporal proximity, four days, is sufficient to raise an inference of causation.

Hubbell argues that Mr. Tift has failed to show causation because at the time Mr. Tift complained of discrimination to Byerman, disciplinary proceedings for Mr. Tift's insubordination were already underway. Hubbell is correct that, "When an employer contemplates an adverse employment action before an employee engages in protected activity,

28

temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne,* 453 F.3d 1301, 1308 (11th Cir. 2006).

Even taking Mr. Tift's testimony that he was not at fault for the August 4, 2011 incident of insubordination with Roper as true, Byerman was clearly contemplating disciplining Mr. Tift before he complained about discrimination and retaliation. Immediately following the incident with Mr. Tift, Roper reported what he considered Mr. Tift's insubordination to Byerman. Then Byerman gathered Union representatives and Mr. Tift's supervisors to discuss the incident. On August 4, 2011, only when Mr. Tift came to the meeting where the Union representatives and his supervisors were already gathered did he then complained of discrimination and retaliation. The existence of this meeting and the presence of Mr. Tift's supervisors and Union representatives shows that Byerman was considering disciplinary action for the insubordination that Roper had reported to him before Mr. Tift complained of discrimination and retaliation. Even if, as Mr. Tift testified, he did nothing wrong to precipitate the meeting, Byerman was considering discipline based on Roper's report of Mr. Tift's insubordination. Even if Roper's report was a mischaracterization of the altercation, it is irrelevant because Byerman called the meeting under the belief Mr. Tift was insubordinate. *See East,* 436 F. App'x at 912 ("[I]f the employer acted on its honestly-held belief that the employee had engaged in misconduct, even if it was mistaken, there is no discrimination."). Additionally, after Roper went to tell Mr. Tift to leave lunch to talk to Byerman, he returned without Mr. Tift and told Byerman that Tift had refused to report to the meeting. Thus, Byerman had reason to and was considering discipline before Mr. Tift even reported to his office and before Mr. Tift lodged his complaint.

Based on Roper's account of the incident and Mr. Tift's further refusal to report to the meeting, Byerman had a reasonable belief that Mr. Tift had refused "to do work assigned, or refusal to obey orders of Supervisor . . . or committ[ed] other acts of insubordination." (Doc. 24-1, at 19). Under the Hubbell Work Rules, that kind of behavior is punishable with "a two or three step advancement in the disciplinary progression, or advancement to either Step 5 or Step 6, or discharge following an investigation by the Company." *Id.* Thus, Mr. Tift cannot argue that he was disciplined more harshly than he should have been because of his complaint of discrimination and retaliation because he was terminated in accordance with the Work Rule's disciplinary progression.

"When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11 Cir. 2006). In this case, Mr. Tift does not produce any evidence of causation other than temporal proximity. *See* Doc. 27, at 20-23. Because that is insufficient to show causation when Hubbell was considering disciplining Mr. Tift at the time of his complaint, Mr. Tift fails to present a prima facie case of discriminatory retaliation. Therefore, the court finds Mr. Tift has filed to prove a prima facie case of retaliation for his termination, and the court will GRANT summary judgment for Hubbell on this claim.

IV.   CONCLUSION

Although Mr. Tift may have suffered an unfair termination, he has not produced enough evidence to show that his termination was because of discrimination for his race or retaliation for his complaints of discrimination and retaliation. "Title VII does not require the employer's needs

30

and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)(quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11 Cir. 2000).

Because no genuine issue of material fact exists and because Hubbell is entitled to judgment as a matter of law on all of Mr. Tift's claims, the court will GRANT summary judgment and ENTER JUDGMENT for Hubbell and against Mr. Tift.

DONE and ORDERED this 7th day of August, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE